UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | CRIMINAL NO. 12-CR-10057- |
| ) | |
| v. ) | VIOLATION: |
| ) | 18 U.S.C. § 1347 - |
| ) | |
| ) | Health Care Fraud |
| DERRICK FIELD ) | |

## INFORMATION

The United States Attorney charges that:

### BACKGROUND

1. The defendant **DERRICK FIELD ("FIELD")**, a resident of New Hampshire, was an employee of Company A.

2. Company A, a Minnesota corporation with principal places of business in McKinney, Texas and Lewisville, Texas, manufactured and distributed in interstate commerce medical devices intended for human use, including bone growth stimulators. Bone growth stimulators were externally-worn devices which emitted pulsed electromagnetic fields to stimulate regeneration of bone in connection with spinal fusions, among other uses. Company A sold three bone growth stimulators: the Spinal-Stim and Cervical-Stim, which were used as an adjunct to spinal and cervical fusion surgery, and the Physio-Stim, which was used to treat bones that did not heal properly.

3. **FIELD** was a Territory Manager covering Massachusetts, New Hampshire and Rhode Island between 2005 and 2011. Field sold the Physio-Stim, among other products.

4.    In 1965, Congress enacted Title XVIII of the Social Security Act ("Medicare" or the "Medicare Program") to pay for the cost of certain medical services and care for persons aged 65 and older, and for persons with disabilities. The funds set aside by Congress to pay for the necessary medical care of these elderly Americans, and any premiums paid by such persons, were referred to as the Medicare Program Trust Funds.

5.    The Center for Medicare & Medicaid Services ("CMS") was a federal agency within the Department of Health and Human Services ("HHS") that was responsible for the funding, administration and supervision of the Medicare Program.

6.    Pursuant to sections 1832(a)(1) and 1861(n) of the Social Security Act, Medicare Part B provided for the coverage of certain durable medical equipment ("DME"). CMS contracted with four Medicare Administrative Contractors to process and pay Medicare Part B claims for DME. Accredited DME suppliers were permitted to submit claims for payment directly to Medicare for devices.

7.    Company A was an accredited DME supplier enrolled in the Medicare program. As an accredited supplier, Company A was authorized to submit directly to Medicare contractors claims for reimbursement for bone growth stimulators provided to Medicare Program beneficiaries.

8.    To obtain payment from Medicare for a bone growth stimulator prescribed by a physician, CMS required Company A to obtain and maintain, among other records, medical records describing the patient's injury or condition.

9.    For DME that was covered by Medicare, Medicare suppliers were reimbursed the

lower of the actual fee for the item or the fee that Medicare approved for the item. The Medicare-approved amount for reimbursement of bone growth stimulators varied over time, ranging from approximately $3,500 to more than $4,400 for each device.

10. Medicare reimbursed 80% of the amount payable to the supplier and the Medicare beneficiary was responsible for the other 20% of the amount. As an example, if the amount reimbursed was approximately $3500, Medicare paid 80% or approximately $2,800, and the patient paid 20% or approximately $700.

11. Medicare published guidelines establishing when a bone growth stimulator was covered for beneficiaries. These guidelines were widely disseminated at Company A. As **FIELD** knew and understood, a Physio-Stim was only covered by Medicare if the patient had a "nonunion of a long bone fracture." A "nonunion" was defined as "radiographic evidence that fracture healing has ceased for three or more months prior to starting treatment with the [bone growth] stimulator." As **FIELD** further knew and understood, Medicare required "a written interpretation by a physician stating that there has been no clinically significant evidence of fracture healing between the two sets of radiographs." *See* NHIC Corp., Local Coverage Determination (LCD) for Osteogenesis Stimulators (L11501). **FIELD** knew and understood that, if this criterion was not met, Medicare would not pay for a Physio-Stim.

12. When a physician prescribed a bone growth stimulator manufactured by Company A, the local Territory Manager collected the medical records and prescription and forwarded these documents to an Insurance Administrator at Company A's home office. The Insurance Administrator prepared and submitted the claim to the applicable insurance carrier.

## FIELD'S SCHEME TO DEFRAUD MEDICARE

13.    Between 2005 and 2011, numerous physicians in **FIELD's** territory prescribed bone growth stimulators for patients who did not meet Medicare's guidelines. On numerous occasions, **FIELD** forged physicians' chart notes and prescriptions to make it appear as though the orders met Medicare's guidelines so that Medicare would pay the claims.

14.    For instance, on July 28, 2010, Dr. II first saw patient AR, who complained of severe pain in AR's left foot. On October 1, 2010, Dr. II performed surgery to repair AR's hallux valgus, commonly called a bunion. That day–October 1, 2010–Dr. II also prescribed a bone growth stimulator for AR to wear after surgery.

15.    As **FIELD** knew and understood, the bone growth stimulator prescribed by Dr. II for AR did not meet Medicare's guidelines, because AR did not have a fracture where healing had ceased for three or more months.

16.    On October 28, 2010, **FIELD** submitted an order for a bone growth stimulator for AR to Company A. The records submitted by **FIELD** were different than the records contained in AR's patient file. **FIELD** submitted a supposed chart note dated June 22, 2010, stating that Dr. II saw AR on that date and that AR "began feeling pain two days ago" and that AR "has a left fifth metatarsal fracture." **FIELD** also submitted a supposed chart note dated October 21, 2010–more than three months later–stating that Dr. II saw AR on that date, that AR "fractured her left fifth metatarsal approximately four months ago," that AR "has developed a left fifth metatarsal non-union" and that "[s]he will be ordered a daily bone stimulator . . ." **FIELD** also submitted a supposed prescription from Dr. II for AR dated October 25, 2011 for Physio-Stim.

4

17. The documents submitted by **FIELD** to Company A were forged by **FIELD**. Among other things, (1) Dr. II did not see AR on June 22, 2010 or October 21, 2010; (2) AR had a bunion, rather than a fracture, in her toe; (3) Dr. II prescribed the bone growth stimulator on October 1, 2010–not on October 25, 2010; (4) the form and content of the prescription submitted by **FIELD** was different from the prescription in AR's patient file; and (5) the font and format of the supposed chart notes submitted by **FIELD** were different than the notes maintained in DG's patient file.

18. **FIELD** forged Dr. II's chart notes and prescription for AR to make it appear as though AR's injury met Medicare's guidelines so that Medicare would pay the claim.

19. Dr. II's order for AR was processed at Company's A's home office, and a claim was submitted to Medicare. Medicare paid $2,796.07 for this claim. **FIELD** received a commission of more than $500 for this order.

20. As another example, in July 2010, patient MM fractured a toe. MM's pain did not subside, and on October 19, 2010 she saw Dr. GT. Dr. GT reviewed MM's diagnosis and discussed potential treatment. Dr. GT also ordered a bone growth stimulator for MM that day, although Dr. GT did not physically fill out a prescription. During follow-up visits on December 21, 2010 and February 22, 2011, Dr. GT reported that MM was using the bone stimulator and discussed treatment options with MM. Dr. GT signed the chart notes electronically.

21. As **FIELD** knew and understood, the bone growth stimulator prescribed by Dr. GT for MM did not meet Medicare's guidelines, because MM did not have a fracture where healing had ceased for three or more months before using a bone growth stimulator.

22. On December 31, 2010, **FIELD** submitted an order for a bone growth stimulator for MM to Company A. The records submitted by **FIELD** were different than the records contained in MM's patient file. For instance, **FIELD** submitted a supposed chart note dated September 15, 2010, stating that MM "returns today for follow-up" and that MM "is one month post right fifth metatarsal Jones fracture." **FIELD** also submitted a supposed chart note dated December 20, 2010–more than three months later–stating that MM "is approximately four months post fracture," that "X-rays show no healing at the fracture site," that "[w]e discussed the treatment for this non-union," and that [p]atient will use a bone stimulator." A hand-written signature appears at the bottom of each supposed chart note. **FIELD** also submitted a supposed prescription for a bone stimulator for MM dated December 20, 2010, bearing Dr. GT's supposed signature.

23. The documents submitted by **FIELD** to Company A were forged by **FIELD**. Among other things, (1) Dr. GT did not see MM on September 15, 2010 or December 20, 2010; (2) MM's fracture occurred in July 2010, not August 2010; (3) Dr. GT ordered the bone growth stimulator on October 19, 2010, not December 20, 2010; (4) Dr. GT did not fill out a prescription; (5) the supposed chart note submitted by FIELD indicates that MM would only begin using the bone stimulator after December 20, 2010, when in fact the stimulator was prescribed on October 19, 2010; (6) Dr. GT's December 21, 2010 chart note indicates that MM was using the device; (7) Dr. GT electronically signed his notes, whereas the notes submitted by **FIELD** contained a hand-written signature; and (8) the font and format of the supposed chart notes submitted by **FIELD** were different than the notes maintained in MM's patient file.

24.     **FIELD** forged Dr. GT's chart notes and prescription for MM to make it appear as though MM's injury met Medicare's guidelines so that Medicare would pay the claim.

25.     Dr. GT's order for AR was processed at Company's A's home office, and a claim was submitted to Medicare. Medicare paid $2,796.07 for this claim. **FIELD** received a commission of more than $500 for this order.

26.     Between 2006 and 2011, Medicare paid at least $250,000 for at least 100 claims submitted by **FIELD** that did not meet Medicare's guidelines and should not have been paid based on forged chart notes and/or prescriptions.

## COUNT 1
## 18 U.S.C. §1347 (Health Care Fraud)

27.     The allegations in paragraphs one through twenty-six are herein incorporated in full.

28.     In or about December 2010, in the District of Massachusetts and elsewhere, the defendant

### DERRICK FIELD

did knowingly and willfully execute a scheme and artifice to defraud Medicare, a health care benefit program, in connection with the delivery of and payment for health care benefits, items and services.

All in violation of Title 18, United States Code, Section 1347.

## FORFEITURE ALLEGATION
## (18 U.S.C. § 982)

29.  The allegations set forth in paragraphs one through 28 are herein incorporated in full.

30.  Upon conviction of any offense in violation of 18 U.S.C. § 1347 as set forth in Count One of this Indictment, the defendant,

## DERRICK FIELD

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

31.  If any of the property described in paragraph 30 above, as a result of any act or omission of the defendant –

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of this Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to 18 U.S.C. § 982(b)(1), incorporating 21 U.S.C. § 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in subparagraphs (a) through (e) of this paragraph.

All pursuant to Title 18, United States Code, Sections 982(a)(7) and Title 28, United States Code, Section 2461(c).

                                        CARMEN M. ORTIZ
                                        United States Attorney

By: _____

                                        DAVID S. SCHUMACHER
                                        JEREMY M. STERNBERG
                                        Assistant U.S. Attorneys